[Cite as *In re L.H.*, 2015-Ohio-369.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

                                             **CASE NO. 17-14-09**

    L.H.,

**ADJUDGED DEPENDENT CHILD.**        **O P I N I O N**

Appeal from Shelby County Common Pleas Court
Juvenile Division
Trial Court No. 2011-DEP-0003

**Judgment Affirmed**

**Date of Decision:   February 2, 2015**

APPEARANCES:

    *John A. **Poppe** for Appellant, Amber Price*

    *Rob C. **Wisenmayer, II** for Appellees, Robert and Susan Hull*

**ROGERS, P.J.**

{¶1} Appellant-Mother, Amber Price ("Amber"), appeals the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, denying her legal custody of her minor child, L.H. On appeal, Amber argues that the trial court erred by failing to issue a case plan and by denying her motion for legal custody when its decision was not supported by competent, credible evidence. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On January 28, 2011, Shelby County Department of Job and Family Services ("SCDJFS") received a report that L.H. was a dependent child. SCDJFS spoke with Amber who informed the agency that she was going to the Miami Valley Juvenile Rehabilitation Center[1] and asked that L.H.'s paternal great-aunt, Sandra Schaffer ("Sandy"), care for L.H. in her absence. Pursuant to a voluntary safety plan, L.H. was placed in the temporary custody of Sandy on January 28, 2011. However, on March 7, 2011, SCDJFS filed a complaint with the trial court alleging that L.H. was a dependent child. On March 24, 2011, L.H. was adjudicated a dependent child pursuant to R.C. 2151.04(B) and (C), and a dispositional hearing was scheduled for May 23, 2011.

{¶3} Before the dispositional hearing, L.H.'s paternal grandparents, Robert Hull, Jr. ("Robert"), and Susan Hull ("Susan") (collectively "the Hulls") and his

---

[1] Amber was charged with gross sexual imposition and complicity to rape. Josh Hull, L.H.'s father, is currently serving a 10-year prison sentence. Both Amber's and Josh's charges stemmed from the rape of Amber's 12-year old sister.

maternal grandmother, Juanita Hoaglin ("Juanita") filed motions requesting legal custody of L.H. On June 2, 2011, the trial court denied all requests for legal custody and placed "L.H. into the temporary custody of Sandra Schaffer subject to protective supervision by the [SCDJFS]." (Docket No. 143, p. 4). Further, the trial court ordered that a case plan be filed within 10 days of the judgment entry. (*Id.* at p. 5).

{¶4} A case plan was filed on June 15, 2011. A review hearing was held, and on October 3, 2011, the trial court found that it was in the best interest of L.H. to be placed into the custody of Amber, subject to protective supervision by SCDJFS. However, as a result of a probation violation, on December 7, 2011, Amber was adjudged a delinquent child and incarcerated for three months.

{¶5} Amber, the Hulls, and Juanita all filed motions for legal custody of L.H. Pursuant to an agreement reached between all parties, on September 26, 2012, the court awarded legal custody of L.H. to Sandy and terminated SCDJFS's involvement with the case.

{¶6} Amber and the Hulls then filed competing motions for legal custody. On November 21, 2013,[2] and January 22-23, 2014, a legal custody hearing was held. Dr. Carol Patrick was the first witness to testify on behalf of Amber. Dr.

---

[2] According to the custody agreement filed on September 26, 2012, all parties agreed that only a showing of best interests would be needed to alter legal custody. However, after the first two witnesses testified on November 21, 2013, the trial court determined that both parties would have to prove a change in circumstances as well as best interests. Both parties requested a continuance, which the trial court granted, and the custody hearing resumed on January 22, 2014.

Patrick testified that she was retained to do an evaluation of Amber during September and October of 2013. During a clinical interview, Amber disclosed to Dr. Patrick that she had been raped at age five by an older brother. After the rape, Amber received some counseling. Despite the trauma from her early childhood, Dr. Patrick believed that Amber did not "appear to be holding significant resentment or anger due to what she's been through" and appeared to be "a very well functioning twenty-one year old." Custody Hearing Tr., Volume I, p. 40.

{¶7} Mike Lawson ("Mike"), Amber's husband, then testified. Mike stated that he and Amber were recently married on January 18, 2014. Before Amber, Mike has been married three times, all ending in divorce. His most recent marriage ended in September of 2013. He has five children with four different women. Mike currently works at Select Art where he is a welder and has health insurance for his family. Mike testified that he gets along well with L.H. and that he has custody of one of his children, K.L.

{¶8} Mike also testified that he has served five years in prison for aggravated robbery and grand theft. Mike was charged with domestic violence in 2003, 2004, and 2005. In 2005, Mike was arrested for assault on a police officer. He was again arrested in a separate instance in 2005 for resisting arrest. Mike pled guilty to a disorderly conduct charge in 2008, which arose from complaints that he was trying to harm himself. In 2010, Mike was arrested and charged with

felonious assault, which was later dismissed by a grand jury. Also, Mike testified that two of his ex-wives have filed protective orders against him.

{¶9} Donald and Juanita Hoaglin, Amber's step-father and mother, both testified that L.H. and Amber have a very loving relationship. Juanita testified that Amber has matured since September of 2012 and is more responsible about her obligations towards L.H.

{¶10} Amber testified that L.H. and Mike's son, K.L., get along well. She also testified that there is no indication that L.H. fears Mike. However, Amber admitted that she received communication from Susan and Sandy that L.H. had been hurt by Mike. Specifically, after dropping L.H. off at the Hulls, she received a text message from Sandy stating that L.H. had a black eye. Sandy accused Mike of hitting L.H. and causing the black eye. Amber denied this, stating that Mike was at work during her entire visit with L.H. This accusation resulted in a court order prohibiting Mike from having any physical contact with L.H. Amber also testified that since September of 2012, she has always picked up and dropped off L.H. at the Hulls' home, not at Sandy's. Amber stated that, in her opinion, it is in L.H.'s best interest for him to live with her and Mike.

{¶11} On cross-examination, Amber admitted that she was recently fired from her job at Elite Enclosures. She also has been receiving counseling since

2012 from Dale Agnew ("Agnew").[3]  However, Amber has completed her counseling program and her last session with Agnew was in February of 2013. Amber explained that her "offense cycle" or what triggers her to offend, is being in abusive relationships.  Amber also testified that her doctor has ordered her to be on bed rest for four weeks due to complications with her pregnancy.

{¶12} Frances Duncan ("Duncan") then testified on behalf of the Hulls. Duncan stated that she is a licensed psychotherapist and has had multiple sessions with L.H.  Duncan has only interacted with the Hulls and has never met Amber. Duncan testified that L.H. has very positive sessions where he is cooperative and well-behaved, but he also has some negative sessions where he is clingy yet aggressive with the Hulls.  According to the Hulls, L.H. would act out after coming back from a visit with Amber.  Duncan also elaborated on one session which concerned her:

> A:  You know he -- I don't know how specific you want me to be but I mean, like with the, um, one of the things he likes to do is the playdough [sic] and we make figures out the -- you know, like you would have a little cookie cutter that looks like a person -- and then he would, you know, who do you want to make and who is this and who is this and, um, and -- and a couple of those earlier sessions he -- he focused on the -- the playdough [sic] and he would, you know, he made Maw and Paw, which is Susie and Bob Hull, he made himself, he made his mother, he made [Mike] and then he would -- push [Mike] and -- his mother back he didn't want -- 'no' and then he would take his -- and put his little figure over by -- he would separate them out.

---

[3] Agnew never testified at the custody hearing.

Q: Okay.

A: And he's done that a couple of times. Uh --

Q: Did that concern you?

A: Well, I mean it's an expression. You know, it can be interpreted, you know.

Custody Hearing Tr., Volume III, p. 438-439.

{¶13} Duncan also testified that in her opinion, the visitations with Amber were causing L.H. distress. L.H. has nightmares, wets the bed, begs the Hulls not to make him go with Amber, and has aggressive behavior. Obviously, "something [is] causing [L.H.] distress somewhere in that picture" but Duncan could not say for certain what caused the distress. *Id.* at p. 440.

{¶14} L.H.'s guardian ad litem, Steve Geise ("Geise"), then testified. In his opinion, L.H. has bonded well with the Hulls. Geise also testified that he was concerned about Amber's lack of stability. Specifically, Geise stated:

> I -- I think in my recommendation, both the original and the supplement, that -- that is part of why I think the Hulls should have custody of the kid -- of the child. I means [sic] [Amber] is twenty -- probably about twenty-two years old now and she's got -- she's been through a lot in her -- in her young life and now she's going through more, you know, with being pregnant. I think that the Hulls probably have a more stable environment. I don't think that there's -- I think Amber should stay bonded with the child. I mean, every time I saw the child with her, I mean, he was next to her, holding on to her, he wasn't afraid of her and I think she -- he needs that bond with her but I think at this point the Hull's would probably be the

[sic] more appropriate for full time custody. However, I think that Amber can provide appropriate care for Rule 22.

*Id.* at p. 473-474.

**{¶15}** On cross-examination, Geise stated that he did not visit Sandy's home when preparing his report because she had told him that she does not want custody of L.H. Further, while Geise considered Mike's prior criminal history in forming his opinion, it was only a small portion of what he considered. Moreover, Geise stated that he had recommended the Hulls receive custody before Mike came into Amber's life.

**{¶16}** Sandy testified that she has two children, who are 13 and 18. In February of 2013, her eldest son started having heart-related problems. As a result, she often had to rush her son to the hospital. After she discovered her son's condition, she asked her sister, Susan, if L.H. could stay with her, so she did not have to drag L.H. to the hospital at all hours of the night.

**{¶17}** Before her son's condition developed, L.H. would stay with her during the week. Susan would babysit L.H. during the day, while Sandy was at work. The weekends were different as L.H. spent some weekends with the Hulls, other weekends with Amber, and a few weekends with Sandy. When asked what concerns Sandy had about Amber being the legal custodian, Sandy replied:

She hasn't paid me child support for about a month now; she's married a man who has a criminal background; her family seems to reconcile like nothings ever happened; she's never, since the

incident at my house[4], she's never tried to communicate with me on [L.H.]'s behalf. Um, [L.H.] has come back from Amber's house with bumps and bruises, he's a child, but when I ask her about it she denies everything. Um, she's brought him back hungry; she's brought him back dripping with sweat; she's brought him back not bathed. Um, she has told me herself that she's scared of her step-dad and mother being around [L.H.], she doesn't feel safe with them. Um, she -- she's -- she seems to be the same -- Amber is -- you can tell Amber is still focused on what is not a priority. [L.H.] is not a priority. Having men in her life is a priority. Her [sic] and her life is a priority.

*Id.* at p. 516-517.

{¶18} Sandy was also concerned about Amber being the legal custodian because after a visit with Amber and Mike, L.H. came back with a black eye and told Sandy that "Mike had hit his eye." *Id.* at p. 525.

{¶19} Susan Hull also testified as to a separate incident where she believed Mike had been physically abusive towards L.H. She testified that in March of 2013, L.H. came back from a visit with bruises, in the shape of handprints, on both sides of his ribcage. She took L.H. to a doctor, who stated that the handprints were too big to be a woman's. SCDJFS was called, but the record is unclear if SCDJFS did anything about the allegations.

{¶20} Susan expressed many of the same concerns Sandy had about Amber being the legal custodian of L.H.:

---

[4] The incident that Sandy is referring to is when Amber engaged in inappropriate sexual conduct while living at Sandy's home. According to Sandy, "Amber was living at my house and was having multiple men come and have sex with them in my bed off of SugarDaddy.com, I even had papers saying that she having -- she was masturbating on me and my fiancé was having sex in our bed." Trial Tr., Volume III, p. 522. After this incident, Sandy kicked Amber out of her home.

Um, I think she's still unstable. I think she should not only for her -- for her [L.H.] [sic] and her unborn baby, I really think she needs to get the help she needs from everything she's been through. Um, and I think -- this is just my opinion, but I think Dr. DeLong would be a good start. Um, [L.H.]'s [sic] came back, like I said, crying and screaming, and he has the same effect -- I don't want to say every single time, but most of the times not wanting to go with her. Of course I don't know why, he just says 'I don't want to go, I don't want to go'. Um, of course I don't know why he does that. Um, my concern is their house size is small for all those children out there. Um, Amber did not get [L.H.] the year of 2013, she did not show up on Easter for her visit. Um, we ended up taking him to Chuck E Cheese on Easter, um, we were the only ones in there actually, he had a ball. Um, she did not show up for Thanksgiving. I think that was a miscommunication, I'm not sure, I just know she did not show up. She did not call him on his birthday and she did not show up [on] her Christmas visit so Sandy came and got [L.H.] and did her Christmas with him and then we got him on Christmas day.

* * *

Um, I'm concerned about her stability and now I'm also concerned for Amber -- for Amber for the position she's in now and for her new husband. Um, from his -- not necessarily criminal history, but his violent criminal history and that not only concerns me for Amber but for their unborn baby as well as [L.H.] Not necessarily if he does it to them but them witnessing it is just as bad.

Custody Hearing Tr., Volume IV, p. 540-541.

{¶21} Robert Hull then testified and stated that he has been employed with Peerless Machinery for the past 25 years. He testified that he believed it was in L.H.'s best interest for him and his wife to have legal custody over L.H. because of the "love that I can provide for [L.H.] that he's going to be lacking of [sic], um, until his parents can get healed. Um, provide a good financial base for him and

hopefully school to push him forward in his life to be a productive member of society and hopefully get things in life he's deserving of." *Id.* at p. 575.

{¶22} On February 13, 2014, the trial court found that there was a change in circumstance and that it was in L.H.'s best interest to grant legal custody to the Hulls. The court's judgment also awarded Amber reasonable visitation with L.H. pursuant to Local Rule 22, and prohibited Mike from physical disciplining L.H. Josh Hull, L.H.'s father, was also awarded two visits per month with L.H.

{¶23} Amber filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN DENYING APPELLANT-MOTHER'S MOTION FOR LEGAL CUSTODY AND IN GRANTING LEGAL CUSTODY TO THE APPELLEE'S [SIC] AS THE TRIAL COURT NEVER ISSUED A REUNIFICATION PLAN.**

*Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT-MOTHER'S MOTION FOR LEGAL CUSTODY AND GRANTING LEGAL CUSTODY TO THE APPELLEE'S [SIC] AS THE SAME WAS NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE.**

*Assignment of Error No. I*

{¶24} In her first assignment of error, Amber argues that the trial court erred when it did not enter a case plan. Without a case plan, Amber was unclear

of what was expected from her and what actions she needed to take to regain custody of L.H.  We disagree.

{¶25} After a child has been adjudicated dependent pursuant to R.C. 2151.353, the trial court has four options.  *In re Moloney*, 24 Ohio St.3d 22, 26 (1986).

> The court may permit the child to remain with the parent subject to court conditions and limitations, including supervision. R.C. 2151.353(A)(1). The court may commit the child to the temporary custody of the welfare department, county children services board, either parent or a relative, or a probation officer. R.C. 2151.353(A)(2). The court may commit the child to the temporary custody of any institution authorized by the state to provide care or treatment to the child, R.C. 2151.353(A)(3), or the court may commit the child to the permanent custody of the welfare department, R.C. 2151.353(A)(4).

*Id.*  Moreover, if the court utilizes R.C. 2151.353(A)(2) or (3), the children services agency must prepare and maintain a case plan to reunite the family.  *Id.*; R.C. 2151.412(A).

{¶26} Here, the trial court adjudicated L.H. a dependent child on March 24, 2011, and scheduled a dispositional hearing for May 23, 2011.  The trial denied all requests for legal custody and placed L.H. into the temporary custody of Sandy, pursuant to R.C. 2151.353(A)(2), on June 2, 2011.  It then ordered SCDJFS to prepare and file a case plan.  SCDJFS did just that, and filed Amber's case plan a few days later on June 15, 2011.

{¶27} Therefore, Amber's argument that she had no direction on how to get L.H. back lacks merit and is disingenuous. Indeed, Amber was initially able to regain custody of her son because she followed the case plan. In part, the case plan required that Amber successfully complete her treatment at the Miami Valley Juvenile Rehabilitation Center and follow the recommendations of the program. It also required that Amber follow the rules of her probation. On August 19, 2011, during a semi-annual administrative review, SCDJFS reported that Amber was making "significant progress" in her case plan. (Docket No. 154, p. 2). As a result, when Amber was released from the rehabilitation center, she received custody of L.H. and an amended case plan was filed. (Docket No. 155). The amended case plan required Amber to provide for L.H.'s basic and medical needs. It also required Amber to work with the We Care Center, follow all of its recommendations, and also abide by the terms of her probation.

{¶28} Amber violated the conditions of her probation by traveling outside of the county without permission and by visiting inappropriate websites in order to meet men. Amber was sentenced to 90 days in jail as a result of her violations. Due to her incarceration, Amber was unable to work with the We Care Center or meet L.H.'s basic and medical needs, and as a result, made "insufficient progress" on her semi-annual administrative review on February 22, 2012. (Docket No. 181,

p. 2). In her next semi-annual administrative review, Amber made "some progress" but was still unable to provide for all of L.H.'s basic and medical needs.

{¶29} While it is true that the trial court did not order a case plan after it gave Sandy legal custody of L.H. on September 26, 2012, it was not required to under R.C. 2151.412(A). Since all parties voluntarily terminated SCDJFS's involvement in the case, the agency was unable to file a new case plan.

{¶30} We further note that Amber's objection to the trial court's failure to adopt and journalize a case plan comes at an improper time. *In re J.M.B.*, 4th Dist. Ross No. 07CA2978, 2008-Ohio-1285, ¶ 24; *In re Brown*, 142 Ohio App.3d 193, 197 (12th Dist.2001). Instead of raising this issue in the trial court, Amber raises this issue for the first time on appeal. It is well-established that an appellate court cannot "consider [an] issue for the first time without the trial court having had an opportunity to address the issue." *State v. Peagler*, 76 Ohio St.3d 496, 501 (1996).

{¶31} Accordingly, we overrule Amber's first assignment of error.

*Assignment of Error No. II*

{¶32} In her second assignment of error, Amber argues that the trial court abused its discretion in granting the Hulls' motion for legal custody and denying her motion for legal custody. We disagree.

*Standard of Review*

**{¶33}** Decisions concerning child custody matters rest within the sound discretion of the trial court. *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Custody determinations "are some of the most difficult and agonizing decisions a trial judge must make," and, therefore, appellate courts grant "wide latitude" to their consideration of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 17-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶34}** On appeal, Amber argues that the trial court did not give enough weight to her expert's testimony and report; overly focused on Mike's criminal history; and ignored the "false and fraudulent conduct" of the Hulls and Sandy. We will discuss each argument in turn.

**{¶35}** Amber argues that the trial court erred in failing to give her expert's testimony and report more weight. While the trial court did not adopt Dr. Patrick's finding that Amber was rehabilitated and well-functioning, it also did not discredit Dr. Patrick's report. Instead, the trial court focused more on the

challenging circumstances Amber is in and also on the poor decisions she has made since requesting legal custody. For example, Amber was recently fired from her job, and thus, has no income to support L.H. Further, she is pregnant with Mike's child and was ordered to bed rest by her doctor. Amber is now living with Mike and his young child from a previous marriage. As a result, in addition to L.H., she is now responsible for two additional minor children. Further, Amber complained that her relationship with Josh, L.H.'s father, was abusive and destructive, and that abusive relationships are what trigger her sexual deviancy. Knowing this, Amber decided to not only start a relationship with, but have a child with and marry a man who has been arrested for domestic violence three separate times and has had two protective orders filed against him from two separate ex-wives.

{¶36} Thus, even if the trial court placed little weight on Dr. Patrick's report, that decision is not unreasonable. Although Dr. Patrick states that Amber is completely "rehabilitated" and "well-functioning" it seems as though Amber is actually regressing and making decisions that will be detrimental to herself and L.H. Amplifying this concern is the fact that Amber will no longer attend counseling sessions with Agnew. Amber spent her childhood being raped by an older sibling. Her sister was also raped by a different older brother. And then, only a few years ago, Amber participated with Josh in raping her 12-year old

sister. Amber has experienced a great deal of trauma and we cast serious doubts on any report that says Amber is wholly rehabilitated after only a short time in therapy.

{¶37} Amber also argues that the trial court overly focused on Mike's criminal history. We can find no error here. Mike has an extensive juvenile and adult criminal history of predominantly violent crimes. While Amber argues that Mike has not had negative contact with the police for over six years, we do not find that this is supported by the record. In fact, as recently as 2010, Mike was arrested for felonious assault. Although the grand jury later dismissed the charge against him due to self-defense, he was still involved in a violent bar fight that resulted in serious injuries to the man who provoked him.[5] Before the 2010 felonious assault arrest, Mike has been arrested three different times for domestic violence, been charged with numerous assaults, including assault on a police officer, and served five years in prison for complicity to aggravated robbery and grand theft. He also attempted to commit suicide in 2008, placing his mental health in question.

{¶38} Most troubling to us is the fact that after a visit with Amber and Mike, L.H. returned to Sandy and the Hulls with a black eye. L.H. allegedly

---

[5] Mike testified that he punched a man at a bar because the man was bothering one of his ex-wives. However, Mike did not diffuse the situation by leaving the bar with his ex-wife, despite being aware of his violent temper. Instead, he stayed, the situation escalated, and he ended up beating up the man so severely that he was arrested and then charged with felonious assault. Thus, Mike has admittedly had negative contact with law enforcement in the recent past.

stated that Mike hit him in the eye. Both Amber and Mike denied that this happened, and both testified that Mike was at work during the entire visit. However, there was also testimony that L.H. had bruises on his ribcage in the shape of handprints, which were too large to be Amber's, after a different visit with Amber and Mike.

{¶39} We cannot find that the trial court abused its discretion when it emphasized Mike's violent criminal history. Indeed, it is a serious concern of this court as well. It is concerning not only because of the allegations against Mike that he has treated L.H. improperly, but also for the potential for Mike to be violent towards Amber in front of L.H.

{¶40} Amber also argues that Sandy and the Hulls participated in "false and fraudulent conduct" and the trial court erred by making no mention of the "fraudulent and fallacious actions * * *." Appellant's Br., p. 10-11. This is probably because Amber failed to argue the conduct of Sandy and the Hulls were "false" "fraudulent" or "fallacious" to the trial court. Again, we remind the Appellant that a party cannot raise an issue for the first time on appeal. *Peagler*, 76 Ohio St.3d at 501.

{¶41} Although not raised by Amber, there are clearly legitimate questions

about L.H.'s placement based on the Hulls' track record in raising their sons.[6]

Their eldest son, Bobbie Hull, was arrested and convicted of importuning and is a

registered sex offender. The Hulls explained that Bobbie was involved with a "

'group sex thing', which may have involved minors" and was caught in a sting

operation. Custody Hearing Tr., Volume IV, Exhibit R., p. 3. Their other son,

Josh, L.H.'s father, is currently serving a 10-year prison sentence for his role in the

raping of Amber's 12-year-old sister and is also a sex-offender. When asked by

L.H.'s guardian ad litem if given custody whether L.H. would similarly end up a

sex offender, the Hulls skirted around the question and answered that "they raised

their daughter the same way and she has succeeded in college and is now in

graduate school." *Id.* at p. 6. To us, this is very alarming and it raises serious

concerns about the example the Hulls set for the children; the way they have raised

their sons to treat women; and the lack of supervision within their house.[7]

{¶42} We recognize that the trial court was in a difficult position when it

determined who should have legal custody of L.H. On the one hand, are the Hulls,

---

[6] We note that the trial court shared our same concerns, which were reflected in its 2011 order of disposition. In this order, the trial court denied the Hulls' request to be L.H.'s legal custodians and continued L.H.'s placement in the temporary custody of Sandy, and eventually granted Sandy legal custody of L.H. The trial court specifically noted that "[o]f significant concern to the Court is the sexual offender status of both of the Hulls' sons: Joshua and Robert Hull, III." (Emphasis sic.) (Order of Disposition, June 2, 2011, p. 3). However, at the January 2014 legal custody hearing, the trial court was persuaded by the Hulls' demonstration that they were capable of being L.H.'s primary caretakers. Under these unique circumstances, we defer to the trial court's assessment of witness credibility and the weight to be afforded to certain evidence.

[7] For example, Amber disclosed to Dr. Patrick that Josh was controlling, possessive, and verbally abusive, calling her fat and telling her that no other man would want to be with her. Amber, as a minor, was also living at the Hulls' house, where she and Josh, an adult, were allowed to have sex. The record is also unclear if Amber and Josh raped Amber's sister at the Hulls' house or somewhere else.

who have raised two sex offenders – one solicited minor girls for sex; the other raped a 12-year-old girl. On the other hand is Amber, who helped coordinate and then participated in the raping of her 12-year-old sister and is now married to a man with a violent criminal history and who has allegedly abused L.H. As a result, we question whether the trial court prematurely terminated SCDJFS's involvement with this case.

{¶43} We can only hope that, unlike his parents, L.H. will be raised in an environment where he neither sees nor experiences any sort of physical, sexual, or verbal abuse. We also hope the Hulls will reexamine how they raised their two sons, determine what went wrong, and change the way they raise L.H. to ensure that their grandson is taught to always respect women. We also expect that the trial court will continue to be mindful of the underlying concerns regarding L.H.'s placement with the Hulls, will remain vigilant with this placement, and will not hesitate to exercise its ongoing jurisdiction should these concerns resurface.

{¶44} Accordingly, we overrule Amber's second assignment of error.

{¶45} Having found no error prejudicial to Amber is the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**
**SHAW, J., concurs in Judgment Only.**

**/jlr**

-20-